No. 2--06--0135                                        filed: 11/27/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| MD ELECTRICAL CONTRACTORS, INC., | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05--AR--1433 |
| FRED ABRAMS and CAROL ABRAMS, | ) ) ) | Honorable Kenneth A. Abraham, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the opinion of the court:

Plaintiff, MD Electrical Contractors, Inc., sued defendants, Fred and Carol Abrams, in quantum meruit to recover for improvements that it made as a subcontractor on a home improvement project. Defendants moved to dismiss the complaint (see 735 ILCS 5/2--619(a)(9) (West 2004)), contending that, because plaintiff had violated the Home Repair and Remodeling Act (Act) (815 ILCS 513/1 et seq. (West 2004)), it could not recover. The trial court granted the motion. On appeal, plaintiff contends that (1) the Act does not apply to plaintiff as a subcontractor, and (2) even if the Act does apply, it does not preclude plaintiff from recovering in quantum meruit. We agree with plaintiff's first contention, and we reverse and remand.

Plaintiff's first amended complaint alleged that, between about June 6, 2004, and October 1, 2004, plaintiff furnished subcontracting services, including electrical equipment and labor, toward the remodeling of defendants' house; that there was no contract between plaintiff and defendants;

and that plaintiff was entitled to $14,984 for the services and materials that it provided. Defendants moved to dismiss the first amended complaint, alleging that plaintiff had violated the Act and thus could recover nothing. Defendants relied on the following sections of the Act:

"§10. Definitions. As used in this Act:

'Home repair and remodeling' means the fixing, replacing, altering, converting, modernizing, improving, or making of an addition to any real property primarily designed or used as a residence other than maintenance, service, or repairs under $500. 'Home repair and remodeling' includes the construction, installation, replacement, or improvement of *** electrical wiring *** within the residence or upon the land adjacent to the residence. ***

'Person' means any individual, partnership, corporation, business, trust, or other legal entity.

'Residence' means a single-family home or dwelling ***." 815 ILCS 513/10 (West 2004).

"§15. Written contract; costs enumerated. Prior to initiating home repair or remodeling work for over $1,000, a person engaged in the business of home repair or remodeling shall furnish to the customer for signature a written contract or work order that states the total cost, including parts and materials listed with reasonable particularity and any charge for an estimate. In addition, the contract shall state the business name and address of the person engaged in the business of home repair or remodeling." 815 ILCS 513/15 (West 2004).

"§20. Consumer rights brochure. (a) For any contract over $1,000, any person engaging in the business of home repair and remodeling shall provide to its customers a copy of the 'Home Repair: Know Your Consumer Rights' pamphlet prior to the execution of any

-2-

home repair and remodeling contract. The consumer shall sign and date an acknowledgment form entitled 'Consumer Rights Acknowledgment Form' that states: 'I, the homeowner, have received from the contractor a copy of the pamphlet entitled "Home Repair: Know Your Consumer Rights." ' The contractor or his or her representative shall also sign and date the acknowledgment form." 815 ILCS 513/20 (West 2004).

"§30. Unlawful acts. It is unlawful for any person engaged in the business of home repairs and remodeling to remodel or make repairs or charge for remodeling or repair work before obtaining a signed contract or work order over $1,000. This conduct is unlawful but is not exclusive nor meant to limit other kinds of methods, acts, or practices that may be unfair or deceptive." 815 ILCS 513/30 (West 2004).

Defendants alleged that the electrical work that plaintiff provided was "home repair and remodeling" (815 ILCS 513/10 (West 2004)) and that plaintiff violated the Act by (1) failing to furnish a proper written contract; and (2) failing to provide them a copy of the consumers' rights brochure or an acknowledgment form. Defendants contended that section 30 of the Act barred plaintiff from recovering.

Plaintiff responded that the Act applies to contractors, but not to subcontractors. Plaintiff contended that the legislature could not have intended to require that a homeowner sign a separate contract with the general contractor and every subcontractor. Here, plaintiff stated, defendants had signed a contract with Apex Builders, Inc. (Apex), the general contractor, which was answerable to defendants for the quality of the work on the project. Plaintiff contended that defendants ought not retain the benefit of plaintiff's work without paying for it.

In reply, defendants contended that the Act applies unambiguously to any "person engaged in the business of home repair or remodeling" (815 ILCS 513/15 (West 2004)) and that the

requirement of a written contract for repairs costing more than $1,000 applies unambiguously to "any person engaged in the business of home repairs and remodeling" (815 ILCS 513/30 (West 2004)). Defendants alleged that Apex had provided neither a written contract nor a consumers' rights brochure and that the obligation to do so devolved onto the subcontractors, including plaintiff.

The trial court dismissed the first amended complaint. The court held that the Act applied to plaintiff even though it had been a subcontractor, not the general contractor, on the project and that, because plaintiff had violated the Act, it could not recover in quantum meruit. Plaintiff timely appeals, contending that (1) the Act does not apply to subcontractors; and (2) even if the Act does apply to subcontractors, plaintiff is entitled to recover in quantum meruit against defendants. Because we agree with plaintiff's first contention of error, we reverse the dismissal of the first amended complaint without reaching the second contention.

Whether the Act applies to subcontractors is a question of statutory construction and thus an issue of law that we review de novo. See In re Estate of Dierkes, 191 Ill. 2d 326, 330 (2000). Our goal is to ascertain and effectuate the intent of the legislature. People v. Wooddell, 219 Ill. 2d 166, 170 (2006). Ordinarily, the statutory language is the best evidence of legislative intent. People v. Maggette, 195 Ill. 2d 336, 348 (2001). Generally, if the language is unambiguous, we must apply it straightforwardly. Woodell, 219 Ill. 2d at 171. If the language is ambiguous, i.e., susceptible to more than one reasonable interpretation (see Reda v. Advocate Health Care, 199 Ill. 2d 47, 55 (2002)), then we presume that the legislature did not intend to create absurdity, inconvenience, or injustice, and we must choose a reasonable interpretation over one that leads to absurd, inconvenient, or unjust consequences (In re Application of County Collector of Du Page County for Judgment for Taxes for Year 1993, 187 Ill. 2d 326, 332 (1999)). We turn to the pertinent sections of the Act.

Section 10 of the Act defines a "person" as "any individual, partnership, corporation, business, trust, or other legal entity." 815 ILCS 513/10 (West 2004). Section 10 defines "[h]ome repair and remodeling" as the "fixing, *** altering, *** modernizing [or] improving" of real property, including "the construction, installation, replacement, or improvement of *** electrical wiring" within the residence. 815 ILCS 513/10 (West 2004). Here, plaintiff was a "legal entity" of some sort, and it installed wiring, lighting, and other electrical equipment in defendants' home. Therefore, defendants contend that, under the statute's plain language, plaintiff was subject to the provisions of the Act. See Central Illinois Electrical Services, L.L.C., v. Slepian, 358 Ill. App. 3d 545, 549 (2005) (electrical contractor performed "remodeling" as defined by Act).

Plaintiff counters in part that the language of the Act is not as straightforward as it appears. According to plaintiff, the particular language and the Act's substantive requirements demonstrate that the legislature wished to regulate only contractors, because normally only they are in privity with homeowners or initiate business relationships with homeowners. Plaintiff observes as follows.

Section 5 of the Act states in part, "The General Assembly recognizes that improved communications and accurate representations between persons engaged in the business of making home repairs or remodeling and their consumers will increase consumer confidence, reduce the likelihood of disputes, and promote fair and honest practices in that business in this State." (Emphasis added.) 815 ILCS 513/5 (West 2004). The consumers' rights brochure required under section 20(c) of the Act lists "warning signs of potential scam" that include "[d]oor-to-door salespersons with no local connections" who offer work at prices far below market; "[s]olicitations *** from a company that lists only a telephone number or post-office box number to contact"; "[c]ontractors who fail to provide customers references when requested"; "[p]ersons offering to inspect your home for free"; "[c]ontractors demanding cash payment for a job or who ask you to

make a check payable to a person other than the owner or company name"; and "[o]ffers from a contractor to drive you to the bank to withdraw funds to pay for the work." (Emphasis added.) 815 ILCS 513/20(c) (West 2004).

Plaintiff argues that the quoted language focuses entirely on the "communications" and "representations" (815 ILCS 513/5 (West 2004)) that occur routinely between general contractors and prospective customers. Plaintiff reasons that by deliberately using the term "contractors" and omitting the term "subcontractors," and by focusing exclusively on the types of interactions that only contractors customarily have with homeowners, the legislature showed its intent to regulate only how general contractors obtain customers and sometimes may exploit those customers.

Plaintiff also contends that to apply the Act to subcontractors would produce absurd consequences that would actually disadvantage homeowners and, thus, could not have been intended by the legislature. Plaintiff reasons that requiring every subcontractor on a project to sign a contract with the homeowner would force the homeowner to become his or her own general contractor and negotiate numerous separate agreements and would also render the general contractor superfluous.

We find plaintiff's arguments compelling. We conclude first that the crucial statutory language, even considered apart from its practical consequences, does not demonstrate unambiguously that the legislature intended that the Act apply to subcontractors. Aside from the contrary indicia of legislative intent that plaintiff has identified, there are further signs that the Act was meant to apply only to general contractors. The extent of a party's obligations under the Act depends on the overall cost to the consumer, not on the specific cost of a particular aspect of the work. Section 15 requires that there be a written contract or work order before the initiation of "home repair or remodeling work for over $1,000" (815 ILCS 513/15 (West 2004)), and a signed form acknowledging the delivery of a consumers' rights brochure is required only when there is a

"contract over $1,000" (815 ILCS 513/20(a) (West 2004)).  The consumers' rights brochure states that among the basic terms to be included in a contract are the "[s]tarting and estimated completion dates" and the "[t]otal cost of work to be performed."  815 ILCS 513/20(c) (West 2004).  Both of these phrases appear to refer to the project as a whole, not the particular task of a subcontractor. Also, the warnings provided by the brochure focus not only on potentially abusive practices by those directly soliciting homeowners to enter into contracts, but also on the rights of the consumer vis-a-vis the general contractor.  The warnings repeatedly refer to "the contractor."  815 ILCS 513/20(c) (West 2004).  Such phraseology strongly suggests that the legislature was concerned about protecting consumers by regulating the conduct of those with whom the consumers deal with directly before entering into contracts.

A review of the Act's legislative history further supports plaintiff's argument that the legislature's purpose in enacting the statute was to protect homeowners from the fraudulent practices of those contractors who directly solicit offers of home repair and improvement services.  During the floor debate on the legislation, Representative Fritchey stated that the purpose of the Act was to "prevent[] *** the fly by night people, *** the people that come and prey on seniors, that come and prey on homeowners after disasters, after tragedies whose homes are in need of repair."  91st Gen. Assem., House Proceedings, May 20, 1999, at 17 (statements of Representative Fritchey). Representative Winters, a sponsor of the legislation, also noted that, "Over the last five years, [the Attorney General] average[s] almost 500 complaints from consumers a year being ripped off by [con] artists who simply go up and down the street looking for the elderly, looking for the unprotected, looking for the uninformed.  This Bill seeks to inform the consumer, it is not onerous to the contractors, a simple brochure and contract language is all it requires."  91st Gen. Assem., House Proceedings, May 20, 1999, at 20 (statements of Representative Winters).  These statements,

and others appearing in the transcripts of the debate, demonstrate that the purpose of the written-contract provision of the Act was to provide homeowners with information regarding the work to be performed and the contractor who was ultimately responsible for the work. See 91st Gen. Assem., House Proceedings, May 20, 1999, at 12 (statements of Representative Black) (noting that the Act imposed additional requirements upon "general contractors"); 91st Gen. Assem., House Proceedings, May 20, 1999, at 19-20 (statements of Representative Scott) (noting that written-contract requirement of Act would provide law enforcement an opportunity to find fraudulent home improvement contractors before they had an opportunity to commit additional acts of fraud).

For all of these reasons, we reject defendants' and the trial court's conclusion that the Act unambiguously applies to subcontractors as well as contractors. Furthermore, we conclude that a construction that requires subcontractors to comply with the Act should be rejected as unreasonable and likely to lead to consequences that the legislature could not have intended. We agree with plaintiff that it is simply not realistic to ask the homeowner, who has already hired the general contractor to manage the project, to negotiate a separate contract with each subcontractor. That would indeed severely burden the homeowner (the Act's intended beneficiary) and perhaps also render the position of general contractor superfluous. We believe that, had the legislature intended such curious results, it would have said so unmistakably. Extending the Act's written-contract requirement to potentially numerous subcontractors would actually saddle the homeowner with far more responsibilities.

Slepian is the only reported Illinois case applying the provisions of the Act. That case, however, did not address the question of whether the Act applies to subcontractors as well as general contractors. In Slepian, an electrical contractor entered into a oral contract with homeowners to provide electrical services over a two-year period as part of a home remodeling project. Slepian, 358

Ill. App. 3d at 547-48. After the homeowners failed to pay the final invoice, the electrical contractor sued to foreclose upon the mechanic's lien it had recorded. Slepian, 358 Ill. App. 3d at 547. As an affirmative defense to the suit, the homeowners alleged that the contractor had violated the Act by failing to provide a written contract and that the contractor was precluded under section 30 of the Act from recovering on its mechanic's lien. Slepian, 358 Ill. App. 3d at 547. The reviewing court reversed the trial court's judgment in favor of the contractor on its mechanic's lien, finding that the contractor had violated the Act by failing to provide the homeowners with a written contract. Slepian, 358 Ill. App. 3d at 550 (holding that the "language of the Act clearly and unambiguously requires anyone engaged in the business of home repair and remodeling to obtain a signed contract before initiating work that will exceed $1,000 in cost"). In Slepian, the electrical contractor did not contend that it was a subcontractor, and the reviewing court did not address the question of whether the Act's provisions apply to subcontractors. The dissenting opinion in Slepian suggested that the electrical contractor did not fall into the "category of contractors from whom the legislature was seeking to protect consumers," because it "did not employ door-to-door salesmen using high-pressure tactics." Slepian, 358 Ill. App. 3d at 554 (Barry, J, dissenting).

We note that courts in two other jurisdictions have held that substantially similar laws do not apply to subcontractors. In O'Donnell v. Rindfleisch, 13 Conn. App. 194, 535 A.2d 824 (1988), the homeowners contended that they did not need to pay the contractor for work that a subcontractor did on their chimney. The homeowners relied on a state statute that imposed registration requirements on "contractors" who performed "home improvement." O'Donnell, 13 Conn. App. at 199-200, 535 A.2d at 826-27. The statute defined "contractor" and "home repair" in broad terms similar to those that the Act uses to define "person" and "home repair or remodeling," and it forbade anyone from "hold[ing] himself out to be a contractor or salesman" without first obtaining an official certificate

of registration. O'Donnell, 13 Conn. App. at 200-01, 535 A.2d at 827, quoting Conn. Gen. Stat. §§20--419(3), (4), 20--420(a) (____).

Despite the apparent breadth of the pertinent language, the court of review held that the statute's registration requirement did not apply to the chimney subcontractor. The court relied in part on legislative history, but it concluded first that the language itself compelled its holding. The court noted specifically that the registration provision mentioned "contractors" but not "subcontractors," even though it also specifically required "salesmen" to register with the state. O'Donnell, 13 Conn. App. at 201, 535 A.2d at 827. Furthermore, the court observed that it would not be reasonable to apply the registration provision to subcontractors on a home repair project:

"We agree with the trial court that requiring subcontractors to register as home improvement contractors would be unreasonable and unduly burdensome in an industry where most, if not all, construction work is *** subcontracted for its completion by a general contractor who oversees the entire project and is responsible for the final result." O'Donnell, 13 Conn. App. at 204, 535 A.2d at 828.

In Meadows v. Higgins, 249 Conn. 155, 733 A.2d 172 (1999), the Connecticut Supreme Court adopted the reasoning of O'Donnell and held that the statute did not apply to subcontractors on home-repair projects. The court explained that the "target" of the act was "the contractor who ha[s] dealt directly with the homeowner and who ha[s] been the party ultimately responsible for the subcontractor." Meadows, 249 Conn. at 167, 733 A.2d at 178.

In Messeka Sheet Metal Co. v. Hodder, 368 N.J. Super. 116, 845 A.2d 646 (2004), a subcontractor on a substantial home-renovation project sought to recover against the homeowners for the sale and installation of an air-conditioning system. The homeowners contended that they were excused from payment because the subcontractor had not obtained the permits required by the

state's consumer fraud statute and had violated the statute in other respects. The statute used terminology similar to that employed in the Act. It defined a "seller" as " 'a person engaged in the business of making or selling home improvements, [including] corporations, partnerships, associations and any other form of business organization or entity, and their officers [and] representatives.' " Hodder, 368 N.J. Super at 125, 845 A.2d at 652, quoting N.J. Admin. Code tit. 45A, §16.2 (____). Among other things, the law prohibited a "seller contracting for the making of home improvements" from starting work before obtaining all of the required state and local permits, and it required a seller to furnish the homeowner with written copies of all guarantees and warranties. Hodder, 368 N.J. Super. at 132, 845 A.2d at 657, quoting N.J. Admin. Code tit.13:45A, §§16.2(a), (a)(10.i), (a)(11.i) (____).

Despite this seemingly comprehensive language, the court held that the plaintiff was not subject to the statute. The court explained that the plaintiff was not "a traditional 'seller' within the [statute]," because the law was "designed to protect homeowners who deal directly with contractors." Hodder, 368 N.J. Super. at 124-25, 845 A.2d at 652. Furthermore, the court quoted approvingly the O'Donnell court's statement that applying a statute such as those at issue in the Connecticut and New Jersey cases would unduly burden subcontractors and homeowners. Hodder, 368 N.J. Super. at 127, 845 A.2d at 654; see O'Donnell, 13 Conn. App. at 204, 535 A.2d at 828. We believe that the reasoning of the Connecticut and New Jersey courts is both highly persuasive and fully applicable here.

For the foregoing reasons, we hold that the trial court erred in applying the Act to plaintiff. Therefore, we do not decide whether, if the Act applied, plaintiff could recover in quantum meruit.

The judgment of the circuit court of Du Page County is reversed, and the cause is remanded.

Reversed and remanded.

McLAREN and O'MALLEY, JJ., concur.